[S. F. No. 10819. In Bank.—December 24, 1930.]

G. WEISSBAUM, Appellant, v. GERTRUDE EIBESHUTZ,
Respondent.

Manson & Allan for Appellant.

Leon E. Morris and Edward M. Jaffa for Respondent.

SEAWELL, J.—This action was brought to enforce payment on an overdue promissory note in the sum of $2,500 made by defendant to the order of plaintiff. Defendant, while admitting the execution, delivery and nonpayment of the note, by way of answer and cross-complaint, alleged in defense that no consideration had been given for the note, and that its execution and delivery had been secured through the fraud of plaintiff, the circumstances of which will more completely be set forth later in this opinion. On the issue thus formed the case proceeded to trial before the court sitting without a jury, a jury having been waived. As is usual in such fraud cases, during the course of the trial two diametrically opposed stories were narrated by the opposing parties, only one of which could be true. The trial judge believed the story of defendant, and accordingly made its findings of fact and conclusions of law in her favor. From the judgment entered thereon plaintiff prosecutes this appeal. The main ground of the appeal is that the findings are not supported by the evidence.

It is too well settled to require citation of authority that if the findings of the trial court are supported by any substantial evidence not inherently improbable they will not be disturbed on appeal. We are of the view that the findings in this case may, by a liberal indulgence of the rule, be held to be supported by the evidence. Much of appellant's arguments go to the weight of the evidence, but that was a matter for the trial court and not an appellate court, and we cannot disturb its findings unless, as a matter of law, the evidence is wholly lacking in that respect. Each party was the chief witness in his or her own behalf, with but slight corroborating evidence of a conclusive character sustaining either.

The story, largely as told by respondent, was that in 1920 she was a widow, deriving her sole income from a valuable apartment house inherited from her former husband. She

testified that she possessed little or no business experience. She was acquainted with one B. J. Klarman, president of the Morning Star Mining Company, who, it appears, was closely associated with appellant in various deals. Klarman tried without success to sell some stock in the mine to respondent. In April of 1920 Klarman introduced appellant to respondent, and from that time on appellant was a very frequent visitor. He, almost immediately, tried to sell her some Morning Star stock, but she refused to buy. After ingratiating himself into respondent's good graces, appellant tried in various ways to secure control of respondent's property. On one occasion appellant asked respondent to place all of her valuables in his safe deposit box; on other occasions he wanted her to put her real property in his name; and on still another occasion, he importuned respondent to place her automobile in his name, all of which respondent refused to do.

After being unsuccessful in interesting respondent in the Morning Star Mine, appellant, as related by respondent, then told her that he was very much interested in the company and was installing machinery in its mine; that he was in on the ground floor; that he wanted to buy some capital stock in said company, but could not have it issued to him directly at that time; that for various reasons he did not want it known that he was the owner of said stock; and for those reasons he asked respondent to take it in her name for him. This she agreed to do.

On the morning of June 1, 1920, appellant called at respondent's residence and delivered to her his check for $2,500, with which to purchase for him 500 shares of the Morning Star stock. Respondent suggested that appellant should have a receipt for the money, and started to prepare one, but appellant handed her a blank form of note, representing it to be a receipt. Respondent could write without glasses, but could not read. Not having her glasses with her, she signed and delivered the document, believing that it was a receipt. Respondent had never in her life borrowed money, nor had she ever seen or signed a promissory note before. Appellant and respondent then proceeded immediately to the office of the Morning Star Mining Company, where respondent asked for and received appellant's stock,

the certificate being made in respondent's name. It appears that the corporation at that time had no treasury stock available for sale, and in all probability the stock purchased was the stock of Klarman. Respondent then placed the stock in her safe deposit box. She frequently offered to return this stock to appellant if he would return her "signature", but appellant kept putting her off from time to time. Appellant then attempted to secure respondent's consent to marriage, but respondent refused all such offers. Finally appellant threatened that unless respondent married him he would sue on the note. Finally, in April of 1922, shortly before respondent was married to her present husband, appellant made his first demand for payment. Until then respondent did not know she had signed a note, nor had appellant referred to it as such.

Respondent at all times has held the 500 shares of stock in question for appellant and has been and now is willing to deliver the same to appellant upon return to her of the document which she signed on June 1, 1920.

Based on this testimony, the trial court found that respondent signed the note under the belief that it was a receipt; that there was no consideration for the note; that the agreement was that respondent was to use the $2,500 to buy stock for appellant and hold the same in trust for him; that the consent of said respondent to the execution of the note was secured by fraud in the manner set forth, *supra*.

Appellant stresses the fact that in the original answer and cross-complaint the defense of fraud based on the idea that the alleged note was a receipt was not set forth, nor did respondent mention this fact on the taking of her deposition. The record shows that this theory was first set forth in the amended answer filed about eleven days before trial. Appellant contends that these facts conclusively prove the receipt theory to be false, and, therefore, the entire story of respondent must fall. In this we cannot agree. The appellant introduced the original pleadings into evidence for impeachment purposes, and this he had a right to do. (*Williams* v. *Seiglitz*, 186 Cal. 767 [200 Pac. 635].) In that case it was directly held that an abandoned pleading may be used for impeachment purposes by showing prior

inconsistent statements. The trial judge admitted such pleadings in evidence for the above purposes, but after hearing all the evidence and observing the demeanor and character of the witnesses and parties, he credited the story set forth in the amended answer. The question as to the weight to be given to the impeaching testimony was one peculiarly within the province of the trial court, and its determination under the circumstances cannot be disturbed.

Moreover, even if there were any merit in appellant's contention in this regard, which there is not, it would avail him but little. The rule is well settled that in regard to a finding of fraud, such finding will be sustained if there is evidence supporting one material fraudulent representation, even though the evidence fails as to all others. In *Beeman* v. *Richardson*, 185 Cal. 280, 281 [196 Pac. 774], Mr. Justice Olney stated the rule as follows:

"As to the finding of fraudulent representations, it is not necessary to detail all the representations which are alleged and found to have been made and the evidence concerning each. If the finding is sustained as to one material fraudulent representation, it is enough."

 Discarding the receipt theory, the evidence of the other material fraudulent representations sufficient to defeat the action on the note is ample.

This case presents an unusual state of facts. It is not one in which the rules appropriate in ordinary business affairs can be inflexibly applied, as there was seemingly involved in the relations of the parties an affair of the heart, and the relations of the parties, especially it would seem on the part of appellant, indicate a matrimonial expectancy. If the parties had been dealing with each other at arm's length, it may be that the trial court would have looked with less favor upon the defenses interposed by respondent. Evidence was also adduced which tended to give color to the theory that appellant and Mr. Klarman, president of the mining company, were in collusion in a plan to unload stock of the mining company upon the respondent, and the appellant made matrimonial overtures to respondent the better to accomplish a mercenary purpose. The conduct of either party is not easily understood, tested by any of the standards which are ordinarily applied in arriving at the true

state of mind of the parties whose action is the subject of investigation.

Appellant bears down strongly upon the inconsistent position in which respondent is placed by her own acts. The signing of the promissory note and the making of a copy thereof by filling in the blank spaces of a copy of a printed form furnished by appellant, which respondent testified she believed to be a receipt for the stock delivered to her by appellant, and the insertion by her of the omitted day of the execution of the note and also the omitted word ''days'' after ''ninety'', and the further fact that while on a visit to an eastern state she wrote to appellant and asked him if he thought she would be able to sell her Gold Star stock (being the stock in suit) when she returned home, and if so she would be very glad, were the most serious inconsistencies which confronted the respondent in presenting her defense. A person will not be heard to repudiate his or her act in executing a written instrument except upon valid and satisfactory grounds. It is urged here that respondent has furnished no satisfactory reason or grounds upon which she can be released from her voluntary act. That a fiduciary relation existed between the parties in the form of an incipient love affair is not denied by the appellant, and it was testified by the respondent that she had confidence in the appellant and accepted much that he said without question. She offered as an explanation of her letter to him that the stock had been given to her to keep for appellant, as had other stock before, and that she unwittingly referred to it as her stock because it was in her possession. On the other hand, the conduct of the appellant in his dealings with respondent is not readily explainable. Respondent had had no business experience with the value of stocks, a field into which she had been bidden to enter by appellant—and the stock in the instant case does not appear to have had any substantial value—while appellant is shown to have had at least a contact with the president of said mining company and a mining stock experience. As to the credibility of the president of the mining company and appellant, it may be said in passing that the reputation of each was made an issue at the trial and weighed by the trial court.

Undoubtedly the evidence would have sustained a judgment for appellant had such a judgment been rendered, but the trial court, who was in close touch with the parties to the action, while we are far removed, saw the justice of the case on the side of respondent. Her explanation as to the promissory note and letter transaction evidently gained the credence of the trial court. No other assignments of error require special treatment.

The judgment is affirmed.

Richards, J., Shenk, J., Curtis, J., Langdon, J., Preston, J., and Waste, C. J., concurred.